*Formatted for Electronic Distribution*                                                                                   *Not For Publication*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

_____

**In re:**

**KIRSTEN LEE WATERS,**                                                      Chapter 7 Case
              **Debtor.**                                                                    **# 05-12019**

_____

**KIRSTEN LEE WATERS,**
              **Plaintiff,**
   v.                                                                                              Adversary Proceeding
                                                                                                    # 06-1013
**EDUCATIONAL CREDIT**
**MANAGEMENT CORPORATION,**
              **Defendant.**

_____

| | |
|---|---|
| *Appearances:*    *Rebecca A. Rice, Esq.* | *Gary L. Franklin, Esq.* |
|    *Cohen & Rice* | *Primmer Piper Eggleston & Cramer, P.C.* |
|    *Rutland, VT* | *Burlington, VT* |
|    *For the Plaintiff* | *For the Defendant* |

### MEMORANDUM OF DECISION
### GRANTING JUDGMENT IN FAVOR OF THE DEFENDANT

      Plaintiff Kirsten Lee Waters (the "Plaintiff" or "Waters") initiated the instant adversary proceeding against Educational Credit Management Corporation[1] (the "Defendant" or "ECMC") in January 2006 to determine whether her student loan debts may be discharged in bankruptcy under § 11 U.S.C. 523(a)(8). The parties submitted a joint pre-trial statement and the Court conducted a trial hearing on January 30, 2007. For the reasons set forth below, the Court holds that the Plaintiff has not met her burden under the test enunciated by the Second Circuit in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir. 1987), and therefore these student loans are not discharged.

### JURISDICTION

      The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 157(b)(2)(I). It is undisputed that this adversary proceeding constitutes a core proceeding.

---

[1] In her complaint, Plaintiff named ACS Education Services, Inc. as the defendant (doc. #1), however, by Order entered April 10, 2006, the Court granted Defendant's motion to substitute Educational Credit Management Corp. as the party defendant (doc. # 12).

## BACKGROUND UNDISPUTED FACTS

On October 13, 2005, Waters filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. An Order Discharging the Debtor was entered on January 31, 2006. On that same day, Waters initiated this adversary proceeding seeking discharge of the student loan obligations she owes to ECMC. The parties entered into a Scheduling Order and an Amended Scheduling Order (docs. # 15, 18), and subsequently submitted a Joint Pre-Trial Statement (doc. # 23) stipulating that the following material facts were undisputed:

1. Kirsten Waters is an individual and resides in Santa Barbara, California.
2. Ms. Waters rents an apartment along with her fiancé for $1,595 per month.
3. Ms. Waters received a bankruptcy discharge.
4. Ms. Waters currently receives $503 per month from Social Security Disability and an additional $356 a month from SSI.
5. Ms. Waters executed a Master Promissory Note on October 21, 2002 in connection with her student loans that were used towards her education at California State University – Channel Islands.
6. A total of $13,278 was disbursed to Ms. Waters in connection with the Master Promissory Note ("Note").
7. ECMC is now the holder of the Note.
8. The loan balance of the Note as of September 18, 2006 was $14,091.60 with interest accruing at the rate of 7.14% or $2.68 per day.

(doc. # 23).  At the trial, only the Plaintiff testified; neither party offered any documents into evidence.

## DISCUSSION

Section 523(a)(8) of the Bankruptcy Code provides that:

(a)  A discharge under [certain sections of the Code] does not discharge an individual debtor from any debt –
  (8)  unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for –
    (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a government unit . . .

This section has been interpreted to mean that a student loan will not be discharged unless the debtor "affirmatively secures a hardship determination." Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 450 (2004).

In the Brunner case, the Second Circuit announced the standard for "undue hardship" that this Court must apply in this adversary proceeding, namely, in order for a debtor to have his or her student loans discharged as an undue hardship, the debtor must establish:

2

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

Brunner, 831 F.2d at 396.  It is the debtor's burden to prove each of the three prongs of the Brunner test.  In re Lehman, 226 B.R.805, 808 (Bankr. D.Vt. 1998).  If a debtor cannot satisfy each and every prong of the Brunner test, he or she is not entitled to discharge the student loan. Williams v. New York State Higher Educ. Servs. Corp. (In re Williams), 296 B.R. 298, 302 (S.D.N.Y.2003) (quoting Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish ), 72 F.3d 298, 306 (3d Cir. 1995)); see also In re Thoms, 257 B.R.144, 148 (Bankr. S.D. N.Y. 2001); Lehman, 226 B.R. at 808. The debtor must prove her case by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287 (1991); In re Maulin, 190 B.R. 153 (Bankr. W.D.N.Y. 1995). The determination of undue hardship is case- and fact-specific, id. at 156, and in the final analysis, the "determination of whether a student loan debt falls under the hardship provision of § 523(a)(8) for discharge is discretionary with the Bankruptcy Judge."  In re Lohman, 79 B.R. 576, 580 (Bankr. D.Vt. 1987).

### A.    The "Minimum Standard" Test

To prove the "minimum standard" component of the Brunner test, the Plaintiff must show that she cannot maintain, based upon her current income and expenses, a "minimal" standard of living if forced to repay her student loans. The evidence reveals that the Plaintiff, now 27 years old and having no dependents, owes an outstanding balance of approximately $13,500 plus interest on the student loans she received in connection with her seven-year effort to graduate from college. She received an Associates Degree in May 2000 from Marymount College in California, and a Bachelor of Arts in 2004 from California State University, Channel Islands.  While she was a full-time student, the Plaintiff held a series of part-time jobs as a waitress and nanny; she quit all of those jobs, perhaps as many as fifty in number, due to mood swings associated with bipolar disorder[2] and the concomitant difficulty she experienced in getting along with her co-workers. She stated that the longest period of time that she had held a job was nine months, and that she had never worked more than thirty hours per week in her entire life. She testified that she had not worked since graduating, and that her illness has worsened. Waters also testified that she was diagnosed with bipolar disorder in May 2001, when she was 22 years old, and that the Social Security Administration determined that she could receive disability benefits dating back to her diagnosis. No records documenting either the diagnosis or disability determination were admitted into evidence.

---

[2] In her complaint, Plaintiff asserted that she suffered "chronic, severe neck pain due to a motor vehicle accident in 1998 and bipolar disorder that restrict [her] abilities to perform basic work activities and maintain moderate social functionality, concentration, persistence or pace" (doc. 1).  However, in her testimony, she made no reference to her neck pain as an undue hardship ground.

3

The Plaintiff's only source of income is from social security insurance and social security disability; they aggregate $890 per month. She stated that she lives with her fiancé in Santa Barbara, California, which she admitted is a very expensive community, adding that many people there are, like her, "barely getting by." Plaintiff has arranged to share half of the living expenses with her fiancé. The apartment rent is $1600 per month, but she pays only $500 per month because a roommate recently moved in with them. She also asserted that she was at the "top of the list" kept by the Santa Barbara Housing Authority for a $500 per month rental voucher. She had been told that the voucher would be available by January 15, 2007, but as of the date of the trial (January 30), it had not been disbursed. She anticipated that receiving this voucher would decrease her rental contribution by $250 per month. ECMC counsel asked Plaintiff about a statement she had made during her deposition that she and her fiancé had moved to a less expensive apartment when she acquired two cats; she responded that they acquired the cats after they had gotten a larger apartment, dismissing counsel's suggestion that the decision to spend more money on an apartment was necessitated by her decision to have cats. The Plaintiff stated that they could afford a bigger apartment because her fiancé had received a promotion, and that they moved because it had been uncomfortable for them to live in such a small space, not because of the cats.

In addition to her housing expenses, the Plaintiff testified that her monthly food budget is $175 (one-half of the household's $350 expense) and she pays $100 per month for her cell phone (she has no land line). While it is her responsibility to pay $70 per month for cable and $15 per month for heat, she has not paid either of these sums in the last four months due to a lack of cash; her fiancé has covered these expenses for her. She stated that she told her fiancé that she will repay him the amounts that he contributed on her behalf, adding that he could not afford to support her. However, she never stated how much he earned per month. She asserted that she spends nothing on clothing or entertainment, she has no car, and that she currently has "minus three hundred dollars" in her checking account.

Plaintiff's schedules I and J (filed in October 2005) do not shed any further light on the state of her finances. She indicates there the following monthly expenses: rent - $100; telephone - $150; food - $350; transportation - $80; recreation - $15; and $10 for a speeding ticket. These figures presumably reflect her expenses while she has been living with her fiancé (whose income is not disclosed on the schedules). Some figures match her testimony, such as the $100 per month for her telephone expense, but the rest do not. For example, she testified that she splits the $350 per month amount listed for food with her fiancé, but schedule J shows $350 for her monthly food budget without any indication that this is the amount of the household budget figure and she pays just $175. Moreover, the Court has no basis for reconciling the difference between the $100 per month rental expense on schedule J and her current testimony that she pays $500 per month for rent. Plaintiff testified that she and her fiancé initially rented an apartment for $700 per month in Santa Barbara, but that figure does not help to explain the $100 per month indicated on

4

schedule J. The only figure to which she testified that was corroborated in the Joint Pre-Trial Statement was the $1595 rent for the apartment she currently shares with her fiancé.

The Court questions the Plaintiff's actual monthly expenses, given the contrasting figures indicated in her schedule J and in her testimony. In addition, it appears that her fiancé of eleven years pays some of her expenses when she is unable to contribute her share. The Plaintiff offered no testimony about whether her fiancé would be able to pay her share of the expenses for some period of time, to facilitate her payment of her student loans, and no testimony that she did not have means of support for her regular monthly living expenses. "Financial adversity alone is insufficient to warrant a student loan discharge on the basis of undue hardship." Paul v. Suffolk Univ. (In re Paul), 337 B.R. 730, 737 (Bankr. D.Mass. 2006)."Unemployment or underemployment are insufficient per se to establish undue hardship." Id. The Court finds that the Plaintiff has not demonstrated that she could not maintain a minimal standard of living if forced to repay her student loan debt and concludes that the Debtor has not sustained her burden of proof on the first prong of the Brunner test.

### B.  The "Future Prospects" Test

As the district court in Brunner recognized, the discharging of a student loan, "require[s] more than a showing on the basis of current finances that loan repayment will be difficult or impossible.... '[D]ischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment.'" In re Brunner, 46 B.R. 752, 755 (S.D.N.Y. 1985) (quoting In re Briscoe, 16 B.R. 128, 131 (Bankr. S.D.N.Y. 1981), aff'd 831 F.2d 395 (2d Cir.1987)). In adopting the district court's three-pronged "undue hardship" test, the Second Circuit stated: "Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is "undue.'" Brunner, 831 F.2d at 396. Although the Debtor in the instant proceeding appears to sometimes have significant difficulty coping with life's day to day responsibilities and maintaining long term employment, she has not established that her future prospects are so hopeless that she will be unable to repay all of her student loan debt.

This Court begins its analysis of the evidence on the future prospects prong of the test by determining whether the Debtor has shown any "additional circumstances impacting on the debtor's future earnings." In re Thoms, 257 B.R. 144, 149 (S.D.N.Y. 2001). Such circumstances have been described as scenarios where "the debtor experienced an illness, developed a disability, or became responsible for a large number of dependents after receiving the [student] loan." Id. For example, in Kelsey v. Great Lakes Higher Educ. Corp. (In re Kelsey), 287 B.R. 132 (Bankr. D.Vt. 2001), this Court found that the debtor suffered from significant medical and emotional maladies and further found that the evidence established that the debtor would continue to suffer with these conditions. Id. at 142. The Court held that

5

the debtor's conditions made it unlikely that she would be able to repay her student loans at any point in the foreseeable future without undue hardship. See id. at 144. What is more, this Court emphasized that it would "closely scrutinize[ ] claims for undue hardship based upon psychological or emotional disability due to the susceptibility of such claims to fabrication, exaggeration and fraud. Well qualified and substantiated expert testimony is essential." Id. at 143.

Here, the Plaintiff's testimony indicated that she took out a portion of the subject student loans after being diagnosed. The Court finds the Plaintiff's testimony credible that she truly believed that she would be able to complete college and support herself, notwithstanding the diagnosis. However, the fact that the Plaintiff applied for and accepted the student loans with full knowledge of her psychological challenges makes it all the more compelling that the she satisfy the Brunner criteria in order to discharge her student loans.

The only evidence offered by the Plaintiff to prove that she actually suffers from bipolar disorder is her own testimony. She claimed that she has a "severe case" of bipolar disorder, where she may undergo multiple mood swings during the course of a day or may experience either mania or depression for days at a time, making employment impossible. She added that her mother also suffered from bipolar disorder and had not been able to work. She stated that a doctor had diagnosed her instantly, told her that she had a severe case, and recommended that she not have children and not work because working could lead to suicidal inclinations. She claimed that her condition had become worse since she was first diagnosed: she is agoraphobic, she cannot handle stress, she procrastinates on important items because she does not have a coping mechanism to deal with stress, and because her condition is getting worse, she has no way of paying her student loan. Her counsel argued that it was "unlikely" that Plaintiff would be able to work in the future.

Although the Plaintiff has provided the Court with her assessment of her condition, stating that her disability will negatively impact her future prospects, and implying that her bipolar disorder is a permanent condition and that she expects it to persist for a prolonged period, she has offered absolutely no corroborating evidence to support these declarations. In fact, she provided nothing -- no medical records, no prescriptions, no expert or other testimony -- to show that she even suffers from bipolar disorder or that this is the basis for her disability classification.[3] The only potentially corroborating evidence in the record is the statement in the Joint Pre-Trial Statement that she receives Social Security Disability. However, that statement did not indicate what diagnosis led to the determination that she was eligible for such payments or the nature of the determination (temporary or permanent). She presented no Social Security Disability documentation at trial.

---

[3] In the Pre-Trial Statement, the Defendant asserted that because Plaintiff has not responded to its discovery requests, it would object to the introduction of any records or documentation that had not been previously produced as being unfairly prejudicial (doc. 23).

6

A similar procedural posture was presented in Shilling v. Sallie Mae Servicing Corp. (In re Shilling), 333 B.R. 716 (Bankr.W.D.Pa. 2005). In Shilling, the bankruptcy court addressed the difficulties presented when a debtor who suffered from bipolar disorder sought to discharge her student loans without offering any expert evidence to support her own prognosis. The court opined:

> While we might give considerable weight to the opinion of a qualified expert concerning the expected duration of debtor's psychological disorders, debtor herself does not qualify as an expert in such matters. Moreover, because she is caught in the maelstrom of her psychological problems, debtor is not in a position to offer an objective and informed opinion concerning her future psychological condition, one what would withstand scrutiny.

Id. at 722. See Nash v. Conn. Student Loan Found. (In re Nash), 446 F.3d 188, 194 (1st Cir. 2006); Burton v. Educ. Credit Mgmt. Corp. (In re Burton), 339 B.R. 856, 874 (Bankr. E.D.Va. 2006). This Court agrees.

This Court reiterates its holding in Kelsey that the Plaintiff was required to offer, at the very least, corroborating psychological and/or medical documentation, if not persuasive expert testimony, that her psychological disorder was expected to persist for a substantial portion of the loan repayment period in order to establish the second prong of undue hardship under Brunner. She did not do so, and accordingly, the Court finds she did not meet her burden under this Brunner factor.

### C. The "Good Faith" Test

The determination that the Plaintiff failed to establish either the first or second prong of the Brunner test obviates the need to examine whether she made a good faith attempt to repay her loans, because Plaintiff can only prevail if she establishes all three requirements. Nevertheless, in the interest of thoroughness, this Court will consider whether the Plaintiff satisfies this third prong of the test, which assesses her "efforts to obtain employment, maximize income, and minimize expenses." O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn), 339 F.3d 559, 564 (7th Cir. 2003). Many courts of appeal have held that a debtor's "effort to seek out loan consolidation options that make the debt less onerous is an important component of the good faith inquiry," as it "illustrates that the debtor takes her loan obligations seriously and is doing her utmost to repay them despite her unfortunate circumstances." Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour), 433 F.3d 393, 402 (4th Cir. 2005) (citing Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete), 412 F.3d 1200, 1206 (10th Cir. 2005); Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch), 409 F.3d 677, 682-83 (6th Cir. 2005)). This represents an indicia of good faith; it is not a *per se* requirement. See Cota v. U.S. Dep't of Educ. (In re Cota), 298 B.R. 408, 420 (Bankr. D.Ariz. 2003). See also Healey v. Mass Higher Educ. (In re Healey), 161 B.R. 389, 397 (E.D.Mich. 1993) (finding debtor's attempt to discharge debt without first seeking to negotiate a payment arrangement with the lender evidenced bad faith).

The Plaintiff has not shown the requisite effort to repay her loans. She testified that she made some loan payments – the monthly minimum – before she was diagnosed, and that she had made "an honest effort when [she] was able to pay." However, she provided no documentation to support her statement that she had made even the first payment. She asserted that she had contacted the student loan representatives after she was diagnosed, and that she was placed first in forbearance and then in deferment. She observed that the corporation servicing her student loan had not asked for payment in a long time, and that she has not received coupon books or bills "for years." However, the Plaintiff presented no documentation to evidence the granting of a deferment or forbearance.

In response to questions from ECMC counsel, Plaintiff acknowledged that she had received several lump sum payments during the period when her student loan was outstanding: $13,194.44, as a supplemental SSDI payment, in 2004; $5,050, in "catch-up" disability payments, in January 2006, which she used to move back to California from Vermont (detailing that she purchased a seat on the airplane for her cat, and spent ten nights in a hotel until she found an apartment); and $7,600 from FEMA as a result of her automobile being damaged in a flood. When asked whether she used any of those lump sums of money to pay her student loan, she responded in the negative, adding that she did not think this was required since her loans were "in deferment." She quite reasonably observed that when she had money, she attributed a higher priority to her housing, clothing, and food expenses than to paying her student loan debt, but she offered no explanation for why she did not pay some portion of the lump sums to the student loan debt.

The choices that Plaintiff made in terms of spending money, in particular the lump sums, do not support a showing of good faith. While she may have believed her loans were in deferment, it is not reasonable for her to have assumed that that status could continue *ad infinitim*. Moreover, if she was aware that she might not be able to work in the future and had these large sums of cash available to her, the responsible response would have been to contact the student loan creditor at that time to inquire about partial payment (or settlement) of the loans. She also offered no testimony that she at any time either sought to consolidate the loans or to find out whether she could pay a small amount per month over an extended period. See 34 C.F.R. § 685.209(a)(2)-(3). Although she testified to having made some attempts to minimize rental expenses, she did not testify that her intent in so doing was in any way related to improving her ability to repay her student loan. The Court concludes that the Plaintiff has not shown that she has made any effort to repay her debt which, at $13,278 plus interest, is not so enormous that it would be impossible to repay over time, even on a fairly limited income.

Moreover, the Plaintiff has not demonstrated that she has made an effort to maximize her income. She appears to be a very intelligent, articulate, and presentable young woman. She has not persuaded the Court that she is unable to hold at least a part-time job. For three years after she had been diagnosed with

bipolar disorder, the Plaintiff attended college full-time and worked at numerous part-time jobs, sometimes up to thirty hours per week. That kind of schedule would be stressful for most people. Nevertheless, she soldiered through and achieved her goal of getting a degree, apparently overcoming the challenges related to her bipolar condition. This Court has no expertise in psychological diagnoses or with bipolar disease and cannot speculate about what someone afflicted with this debilitating psychological malady might be competent to accomplish. However, the Plaintiff has asked the Court to determine whether she has demonstrated grounds for allowing her to discharge her student loan. The Court must answer the question presented based on the evidence presented. The record indicates that the Plaintiff was diagnosed with bipolar disorder, decided to continue to work toward a college degree, proceeded to obtain student loans, completed an undergraduate degree, consistently worked part-time while in school full-time, and has not worked at all since graduating. There is no reliable evidence of any change in her condition since graduation, no record that she made any effort either to repay the loan or to obtain gainful employment since graduation, and no evidence that she made any effort to negotiate a resolution of her student loans. This Court concurs with the conclusion reached by the bankruptcy court in Thompson v. New Mexico Student Loan Guarantee Corp. (In re Thompson), 329 B.R. 145 (Bankr. E.D.Va. 2005): "It would be inappropriate for this Court to endorse a justification on behalf of the debtor for her lack of good faith in repaying her student loans, based solely on her psychological state, with no medical or any other substantive evidence. . ." Id. at 188. Accordingly, the Court has no choice but to find that the Plaintiff has failed to meet the final prong of the Brunner test.

## CONCLUSION

While the Court is sympathetic to the difficult life circumstances testified to by the Plaintiff, it is bound to base its determination on the evidence presented and the record falls far short of warranting the relief she seeks. The Court finds that the Plaintiff has not proven by a preponderance of the evidence that compelling her to repay her student loans would impose an undue hardship upon her. The Court therefore declares Plaintiff's student loans are excepted from discharge pursuant to 11 U.S.C. § 523(a)(8) and will enter an order granting judgment in favor of the Defendant.

This constitutes the Court's findings of fact and conclusions of law.

_____
February 2, 2007                             Colleen A. Brown
Rutland, Vermont                             United States Bankruptcy Judge

9